Case number 225820, Thompson Research Group LLC versus Winnebago Industries Incorporated, oral argument not to exceed 15 minutes per side. Mr. Paul for the appellant. Good morning and may it please the court. My name is Brian Paul. I represent Winnebago Industries Inc. and I'm reserving three minutes for rebuttal. All right. Given the evidence most favorable to the judgment, there was no contract here because the parties never agreed on the essential term of price. TRG admitted at trial that there was only an agreement to agree on price later if and when Winnebago acquired TRG, excuse me, Grand Design. To our knowledge, no Tennessee court has ever found a contract to exist in such uphold the verdict on the basis of TRG's equitable claims. And the answer is no for two primary and independent reasons. One, questions one and two on the verdict form allowed the jury to find in favor of TRG on any one of three different claims, two legal and one equitable, and it's impossible to tell which claim or claims the jury accepted. Two. The jury found a breach of oral or implied contract, did they not? But we don't know whether that means breach of oral contract, breach of contract implied in fact, or breach of contract implied in law. Okay, but I mean you're talking about equitable claims or contract claims and they found on the contract claims they didn't go to the equitable claims. No, it's not clear that they didn't reach the equitable claim of breach of contract implied in law. The only thing that's clear is that they didn't reach the separate claim of unjust enrichment. Okay, so that was separated out, unjust enrichment. That was the only claim that was separated out. Okay, I mean you basically admit that your client agreed to pay a fee for the services performed by Thompson, do you not? That is the evidence most favorable to the judge. Alright, but you say that the amount of the fee was not agreed upon. The precise amount, correct. Okay, is this any different than just a, I'm trying to analogize other situations, I think the trial judge did this too. If a teenage boy goes to your door, knocks on the door and says, I'll be glad to cut your grass for a fee, and the Is he not entitled to be paid? He might be entitled. Isn't he entitled to be paid a reasonable fee for the services? In equity, correct. In equity he would be entitled, but the parties have not referenced a method by which. You've got the market, the standard market fees for finding, there's a lot of testimony about that. In order to contract with reference to the market rate, the parties actually have to, that's the Doe versus HCA case. They actually have to contract with reference to the market rate. But even if I accept Isn't the market rate implied? No. When they have agreed to pay a fee and the fee is a reasonable fee, isn't the standard market fee like the default fee? That is the standard for equity, but not contract. The standard, the measure of damages for contract is expectancy damages, which is different than reasonable value. For there to be a contract, the parties actually have to settle on a price, and that price has to be fixed indefinite, or they have to reference something that would allow them to determine what the price is. It can't be left open to negotiation. TRG admitted here that all it had was an agreement to agree to a price later if and when Winnebago acquired TRG, so it was left open for negotiation. Even if we accept the premise, however, that an agreement to pay a finder's fee, a bear agreement to pay a finder's fee, means per se an industry standard finder's fee, there's a $5 million difference between the low end of the range and the high end of the range with no agreed upon criteria for determining where along that range the ultimate price should fall. It's simply left open for future negotiation. The parties never contracted with reference to any criteria for determining whether TRG was entitled to a 1 percent fee, a 1.5 percent fee, or a 2 percent fee or something else. And in fact, TRG never explained what would entitle it to the low end of the range, the middle of the range, and the high end of the range. Let me ask you this. You were complaining about the jury form, the verdict form. Were the jury instructions, did the jury instructions encompass the equity argument or implied in law? Even if the jury form was deficient, were the jury instructions on that issue adequate? No. The jury, so the first question on the jury verdict form, it's important to understand and focus on the specific language. It asks the jury to decide whether there is a contract, oral or implied. And as I indicated to Judge Griffin, that can include both legal claims and an equitable claim of breach of contract implied in law. The jury was instructed on the elements of a claim of breach of contract implied in law, but critically it was not instructed on the measure of damages for breach of contract implied in law. The court gave one generic instruction as to the measure of damages for breach of contract. Looking at that, that includes both the legal claims for breach of contract, which are governed by an expectancy measure of damages, as well as a claim for breach of contract implied in law, which is governed by a different measure of damages, the actual value of the services rendered. And that's the essential problem. Not only can you not tell from the verdict form whether the jury accepted the legal claims or the equitable claims or all of them, but also the jury was not properly instructed on the breach of contract implied in law as to measure of damages. Let me ask you this. If the parties never agreed to the compensation amount, did your client authorize Thompson to proceed with performance? What would be performance under the putative contract? Or was it ambiguous as to whether they were instructed to proceed? Well, the only performance that T.E.R.G. ever purported to provide Winnebago was providing the tip. And they did provide the tip, but there was no predicate agreement on price. And so what I'm trying to make clear here is while there was no agreement on price and therefore no breach of legal contract, they still had equitable claims by which they could pursue compensation. The problem is at a minimum we're entitled to a new trial on those equitable claims because you can't tell, again, from the verdict form whether the jury accepted the legal claims or the claim of breach of contract implied in law, which is an equitable claim. And separately, the jury was not properly instructed on the appropriate measure of damages for breach of contract implied in law. The judge gave no instruction on that particular claim. All right. You submitted your own jury instructions in your own verdict form, right? Correct. Did you make specific objections to the verdict form that the trial judge gave and to the specific jury instructions that the trial court gave? Yes, Your Honor. You did? We proposed our own. I know you proposed it. Did you make specific objections to what was made? Well, not specifically to the verdict form, but it's... All right. So you did not make objections to the verdict form. How about to the instructions? Did you make objections to the instructions? Yes. To the instructions? Yes. We absolutely argued that the equitable claims should be combined because they were confusing. Number two, there should be a damages instruction on the claim for breach of contract implied in law. And three, that the judge needed to instruct the jury on the proper standard of proof for determining an industry standard, which was a critical issue. The judge gave no instructions. All right. I'll check the record to see if you actually did make specific objections to the instructions, but I don't think you did. We did. We absolutely did. We argued specifically that the judge needed to give instructions on industry standards, and he gave no instructions on industry standards. We absolutely argued that an instruction should be given as to the measure of damages on breach of contract implied in law, and that was not given. Those are the two critical instructional errors as to the equitable claims. Well, I want to circle back to one of Judge Clay's first questions with respect to these claims. He indicated that the jury instructions as to damages for implied in contract and implied in law were problematic. But what I'm interested in is, were there instructions specifically on the elements for each one of those separate claims? Yes. So assuming that there were instructions for these are the elements for a breach of contract or a contract implied in law and a contract implied in fact, can't we assume that based upon the verdict form and the fact that they didn't find unjust enrichment, that they at least understood the distinction, the jury that has understood the distinction between what is a contract implied in law versus a contract implied in fact? Yes. But, again, they weren't instructed on the proper measure of damages for breach of contract implied in law. And you can't tell, again, whether the jury intended to award in favor of TRG on the claim for breach of contract implied in law. And if it did that, it followed the wrong measure of damages. Again, because the judge only gave a generic instruction on the measure of damages for breach of contract implied, breach of contract generally. I'd like to come back to Judge Griffin's question about the objection to the verdict form. Winnebago made absolutely clear, as I indicated before, that the equitable claims were duplicative and there needed to be an instruction on the measure of damages for breach of contract implied in law, which was and is the same as unjust enrichment. When the court asked towards the end of the instructional conference, are there any other concerns from the defendant, Mr. Harmon for Winnebago said, we believe the verdict form that we provided, which is significantly lengthier, of course, is the appropriate one in this case. The court said, objection noted. Well, is the appropriate one. I mean, it means that this is accurate as well, but it doesn't have a specific objection of what specifically is wrong with what was given. Well. The fact that it might be a better form doesn't mean the form that was given is reversible error. In other words. That's the problem, I see. In other, this court has held in Gadsky that formal objections to instructions, and I assume that extends to verdict forms, need not be formal. That objections need not be what? Need not be formal. Formal objections do not be formal? Excuse me. The objections to the instructions need not be formal. You just need to make the judge aware of the problem. And Winnebago did that. But even if you disagree with that, this can still be reviewed on plain error, because the error is plain and obvious. TRG doesn't even argue in its brief that you can't tell on the verdict form which claim or claims the jury accepted. And as a matter of fundamental fairness, parties are entitled to know on what ground they lost. And they're also entitled to know on what ground they lost so that they can challenge the judgment on appeal. Well, parties are entitled to know on what grounds they lost. I mean, a lot of juries are given just a general verdict form without specifics as to elements A through B. I mean, you know, just to find in favor of the plaintiff, damages, without specifying all the elements. I mean, are you saying that a general verdict is reversible error? It is when the jury is not properly instructed on the measure of damages on one of the claims that is encompassed in the general verdict. And here, that's exactly what happened. The judge refused to instruct the jury on one of them. All right. Thank you. Thank you. Good morning. Good morning. May it please the Court, Jeffrey Zeger, along with Tom Dundon, on behalf of the Appellee Thompson Research Group, or TRG. This appeal follows a two-week jury trial in which the jury heard testimony from a dozen witnesses. It reviewed nearly 100 exhibits, and it ultimately concluded that Winnebago breached its contract with TRG, and that as a result, TRG was entitled to $5 million in damages. Although Winnebago has offered a litany of legal arguments in an effort to reverse that verdict, each runs counter to Tennessee law as well as the evidence that was submitted at trial. And at bottom, this is a simple breach of contract case in which the jury made a credibility determination. The jury determined that TRG's evidence and testimony as to the terms of the party's agreement was more credible than Winnebago's, and nothing in Winnebago's briefing or in the arguments we've heard this morning should cause this Court to set aside that determination. I think there are, in essence, four arguments that Winnebago has raised, arguments with respect to contract formation, arguments with respect to the jury instructions and the verdict form, arguments on the equitable claims, and then as well, arguments on prejudgment interest. Time permitting, I'd like to dive into all those, but before I do, I think it's worth emphasizing that ultimately this was a credibility determination by the jury. The jury concluded that TRG and Winnebago had a contract, that Winnebago breached the terms of that contract, and that the elements of that contract were that TRG would be paid a finder's fee, and that Sarah Nielsen specifically understood what that meant. Sarah Nielsen, the CFO of Winnebago. Many of Winnebago's arguments about contract formation and industry standard ask this Court to assume that Sarah Nielsen did not understand what a finder's fee was, and I think it's replete... She testified she didn't understand, at least she didn't understand or necessarily agree with the expert witness testimony. That's correct. She did testify that she did not, she was not familiar with the industry standard for the RV industry. However, that is not undisputed testimony, as Winnebago argues in their briefs. TRG put forth evidence from at least three witnesses, its expert Jim Carmack, Chris White, and Catherine Thompson, that Sarah Nielsen did know exactly what a finder's fee was, and that she did agree to that. Were they reading her mind? It's circumstantial evidence. It's not direct evidence, obviously, but both Jim Carmack and Catherine Thompson testified that the reason they didn't, well, Jim Carmack being the expert, that absolutely they would expect the CFO of a publicly traded company who is dealing with Wall Street every day, these are sophisticated parties who are familiar with acquisitions, would know what a finder's fee is in the context of an acquisition. You also would expect parties that are going to enter into a transaction with a multi-million dollar finder's fee would put something in writing, at least a confirmatory letter, a something. I mean, here we only got people talking to each other. And there was testimony at trial about that from both Chris White and John Philpott, who was someone who worked with TRG, who had done this before multiple times, explaining that that's really just not how it's done. Well, it would be one thing if there was a course of dealing between the parties here and they had had prior transactions where they had done everything in Orly and no, no, nothing in writing and all like that, but that's not the case in these circumstances. That's true and that's why I think the testimony from Chris White is perhaps the most compelling upon which the jury based its credibility determination. When Chris White was testifying as to the conversations he had with Sarah Nielsen, he was very clear that he said to Sarah Nielsen, if TRG brings you this opportunity, if Winnebago successfully acquires Grand Design, will you pay us a finder's fee? And she said yes and she did not ask any questions. She did not say, what does that mean? I just want to make sure I understand what you're talking about. Can you send me something in writing? She did not give any response to indicate that she didn't understand exactly what he was talking about. And they actually had a follow-up conversation because the one question she did have was about the mechanics. Explain to me the mechanics of this payment. How is the money going to flow? Is it going to be part of the transaction? Is it going to be paid outside of the transaction? Which caused Chris White to go back to their compliance person and then follow up with Sarah Nielsen to say, here are the two different methods by which the payment can take place. And her response was, I don't know which one we'll pick, but either one will work. Again, no questions to suggest that she did not understand exactly what was being asked in terms of a finder's fee. I say all of that to say, I think there was definitely evidence in the record sufficient for the jury to make a credibility determination that Sarah Nielsen did understand what a finder's fee was and she knew what she was agreeing to, which negates the need to delve into any of these other issues. Well, even though she testified she did not know, the jury did not have to accept that testimony. Correct. They could find that her testimony is not credible. When I picked up the file, I thought it was rather incredible that there is no statute of frauds for a $5 million claim. But we're in Tennessee. There's never an allegation that Tennessee has a statute of frauds requiring written contracts for $5 million, which I think is a little odd, but that's why we had a trial here. Anyway. That's correct. And so I think even if we get past, essentially the court would have to ignore the credibility determination in order to get to the contract formation and the industry standard arguments that Winnebago makes. Even if we get to that point, however, I think the Doe case We don't know if the jury made its determination based on credibility determinations or other bases. There were no special interrogatories to the jury requiring the jury to set forth the basis for the verdict in that regard. That's true, but we do know exactly what the jury found in terms of which cause of action. That gets to, I think, questions that all three of your Honors were asking. Can you speak to that? Because you make a compelling case that the jury made a credibility determination. Clearly, they came up with a verdict, but as we're sitting here today, can you tell us which cause of action did the jury find in favor of? Is it a breach of contract implied in law? Is it a breach of contract implied in fact? Which is it? It is a breach of contract, whether that's an express oral contract or an implied in fact contract. I think Winnebago would acknowledge those are mirror claims and that distinction is not significant. The significant distinction from Winnebago's standpoint is what about this third equitable implied in law contract claim? We know that the jury did not go down the equity path. We know that from looking at the verdict form in tandem with the jury instructions. Because the first question that the jury was asked on the verdict form was, do you find there was a contract between TRG and Winnebago? They checked yes. The very first element in the jury instructions of an implied in law contract is that there is no contract. If the jury is following the instructions on what an implied in law contract is, there's no reason for them to check that first box that there was a contract. Because the first element of an implied in law contract is no contract. Then we get to the second question. Was there a breach? Did Winnebago breach its agreement? Again, following the jury instructions, breach is not an element of implied in law contract. So if the jury is following the proper instructions that set forth the elements of each one of these causes of action, there would be no reason for them to check either box one or box two if they were going down the implied in law equitable claim. And I think it's worth noting that the jury had no questions in this case. At no point did they ask the court any questions or clarifications. So I think there's no doubt from the way that the jury filled out the verdict form, they found there was a contract. Whether it's express, oral, or implied in fact makes no difference. Those are effectively the same claim and Winnebago admits as much in its brief. I do want to return to the contract formation issue because although we haven't discussed it much today, that was a big part of Winnebago's brief. I think to the extent this court is looking for a standard on contract formation with price terms that are less than specific in terms of price, the court need look no further than the Doe case and the 4-8 case and reading those two cases together. Winnebago wants to argue that the lack of a specific dollar amount somehow makes this contract unenforceably vague. That is not the law in Tennessee. The Doe case makes very clear that a specific dollar amount is not required for a price term and it talks about as long as there is some sort of practicable method with either reference to a document or some other extrinsic fact from which the court can assess what the price term is, that is sufficient. I think the facts of Doe are important in that regard. In Doe, you had the situation of a patient at a hospital essentially signing a contract prior to a surgery that says you understand you will be responsible for any charges that are not covered by insurance. The issue was what does charges mean when she got the bill ultimately? The evidence in that case was that charges came from a charge list that the hospital maintained, but that charge list was entirely confidential, the patient had no access to it. And that charge list, which contained just, it was I think over 700 pages with several thousand different itemizations of every conceivable thing you could have done at a hospital and how much it would cost. Not only was that document confidential, it changed on a weekly basis based on real-time cost data to the hospital. And so in that context, the court said charges is not sufficiently definite to form a contract. That is not what we have here. Here we have a term of art, we have a finder's fee. There was uncontroverted testimony, Wittenbego did not put on an expert witness to sell any juror anything other than what TRG's expert said. That a finder's fee is a term of art, it means one to two percent in this industry. That was undisputed at trial. This case is much more akin to the 4-8's case, which I think if we read through the lens of Doe, makes clear that a finder's fee is sufficient. In 4-8's, the issue was the price term was fair market value of property. And in that case, the court ultimately determined that that was not sufficient. But it was not the fair market value language that was problematic, it was the addition by the parties in that case. It had to do with real property. And they agreed to pay the fair market value, but they also agreed to later come to an agreement that they would work together in good faith as to what specifically fair market value meant. And the court was very clear that if the parties had just left it as we agree to pay fair market value, that would have been sufficient. It was the extra agreement that we will come to an agreement on what that is that rendered the contract unenforceable. Well, here though, there's not an agreement that we'll agree to industry standard. There is an agreement. I think the testimony from Chris White and Catherine Thompson and James Carmack all make clear that the agreement was you will pay us a finder's fee. Now, Winnebago wants to argue that you need to say the term industry standard in order to be entitled to industry standard. But I don't think adding those words expressly to say industry standard is necessary to be entitled to the industry standard. Well, wouldn't that be the analogy though? I mean, when you talk about the other case, what they agreed to was they will agree that it's going to be fair market value. Why wouldn't, I mean, what's the distinction there to say that here there wouldn't have to be an agreement that we're going to agree that we'll pay the industry standard. We'll determine within the industry standard where it will fall, whether it's 1%, 1.5%, 2% later on down the line. Because finder's fee is a term of art in this industry, which is to say the actual. Which means 1 to 2%, right? Correct. So don't you have to, isn't there some secondary discussion that would have to be had later on down the line such that you know what the range is going to be? No, because if you think of the 4-8's example with the fair market value, if that had played out, it's entirely permissible for it to come in through expert testimony or through lay witness testimony for someone to say, well, the fair market value of this property is between $1.5 and $1.7 million. Or perhaps there would be dueling experts who have themselves a range of opinions on what the fair market value is. So I think the fact that there may be a range of potential options within an unspecified price term does not negate the fact that it can be sufficient at least to form a contract. The question of the range really comes then into play with damages of where do we fall on the damages side of things. But for an enforceable contract, finder's fee is a term of art just like fair market value is sufficient to form the price term of the contract. I want to also briefly touch on the clear and convincing evidence standard. We didn't really get into that much in the questioning of Winnebago, but it's clearly in their brief. Two quick points on that. One, that is not the standard for proving industry standard. The cases that Winnebago has cited are not cases in which a party was attempting to define a price term or really any term of a contract. Those were actually cases in which one party was attempting to justify its behavior by saying, well, of course you would know that I would do this because this is how we always do it in the industry. The example of the construction case involved the construction of coffer dams, and you had two subcontractors, so they didn't have a contract with each other, it was not a breach of contract case. One subcontractor was in charge of dredging, the other was in charge of hauling out the rock. And part of the hauling out the rock process meant that they would make a road of rock to get the trucks in and out. And that rock was getting sucked up into the dredging company's machines. So the dredging company sued the rock hauling company and said, your rocks are destroying our machine. And in a defense, the rock company said, well, this is industry practice. This is how we always, you should have known we would make a road. That's entirely different than trying to define a price term that does not have a specific dollar amount. And I read those cases as really going more towards, if you're trying to establish custom and usage from a quantitative standpoint, you need to put forth some evidence in the record beyond, well, this is how it happened once, to establish that sort of clear and satisfactory language. But that is not the same as the ultimate burden of proof being clear and convincing with respect to establishment of a contract. And the second point I would make on that is it was undisputed. Winnebago did not put any evidence into the record, did not have an expert on the definition of a finder's term, of a finder's fee. So there was no contrary evidence as to what a finder's fee is. Well, since you're talking about the evidence, let me ask you a question about the evidence in the case. After the alleged contract negotiations, well, not alleged, they actually were contract negotiations, there came a time when, if I understand, Thompson went to Grand Design to talk about acquisition of Grand Design, which was the ultimate objective of your client. And Grand Design said, no, we're not up for acquisition, no, we don't want to be acquired by you. And then, as I understand, subsequently other events unfolded and developed and subsequently there was a transaction. When Grand Design indicated that they were not available for acquisition, why didn't that end the contract, if there was one, between the parties for the finder's fee that the jury determined that you were entitled to? There's two points on that and I'll try and be brief because I know I'm out of time. One is factual and one is legal. The factual chronology from the evidence that was presented at trial is that in January of 2016, that's when Winnebago and TRG have this meeting at the airport. They've at that point already explained what the idea is, that it's Grand Design, but they have a meeting. At that meeting, Michael Happy, Winnebago's CEO, gets the contact information for Ron Fenwick, who's one of the Grand Design co-founders, to follow up. That phone call, which I think is what your Honor is referencing, happens then in February, so a few weeks after that meeting. The testimony at trial, which was, I believe, confirmed in a letter that was also presented by Winnebago's General Counsel to Thompson Research Group, was not that Ron Fenwick said, no, Grand Design's not for sale. He was a little bit more cagey about it and he said, well, I don't really think you can afford us. We would be somewhere in the neighborhood of $300 to $400 million. We also have in evidence an exhibit that was Sarah Nielsen's notes from that conversation, her notes with her conversation with Mike Happy about that conversation, where she reflects that Grand Design gave a price term and that this would be really exciting. From a factual standpoint, there was certainly evidence in the record for the jury to conclude that Grand Design was very much still interested in being acquired and, if anything, was perhaps just playing a little bit of hardball to try to negotiate. From the legal perspective of why that doesn't cut things off, that goes to the distinction between a finder's fee and a broker. We've cited the court to the Legros case from Ohio, which I think does a good job of explaining those are two separate and distinct functions. Serving as a broker means you are actually retained by one of the parties to bring this transaction together. You are representing one party and you do not get paid unless that transaction comes together and you are responsible for bringing it together. By comparison, a finder is an entirely separate concept and a finder is not responsible for bringing the two parties together. The stock and trade of a finder is simply the information. I think you answered my question. You're going into something else. Since your red light has been on for a while, you might want to wind up. In that case, it's our position that the judgment should be affirmed in all respects. Thank you. Thank you. Edward Buttle. A couple of points. One, this is not just a credibility determination. It is undisputed under Tennessee law that the determination of whether a contract has been formed is a question of law. See the Cadence Bank case. Two, TRG asked for a finder's fee. It never even asked for the industry standard finder's fee, let alone a finder's fee of one to two percent. But again, even if you think that the bare request for a finder's fee is a request for the industry standard finder's fee, the parties never contracted with reference to any criteria along the range how the ultimate price would be determined. Of course there has to be further discussion about what the ultimate price would be. If the parties had said, expert Joe Smith will ultimately determine what the fee is for, then that might be a binding contract. But they didn't do that. As to the instruction on the industry standard, this is a very critical point because it cuts across all of the claims. Industry standards do have to be well known. On that, the parties agree. And they have to be proved by clear and convincing evidence. And TRG has not said otherwise in its brief. He has not pointed to a single case that says industry standards need to be proved only by a preponderance of the evidence. The jury, however, was not instructed at all on industry standards. Not a single instruction used the words industry standards. And this was highly prejudicial. Sarah Nielsen, as Judge Clay pointed out, testified that she had never heard of this industry standard. Even TRG's expert, James Carmack, couldn't identify a single transaction in the RV industry or in any industry where this supposed finder's fee had been paid. In fact, he admitted he had no familiarity with the RV industry. TRG's owners were not personally aware of an industry standard finder's fee. Brian O'Day, TRG's regulatory counselor, never heard of an industry standard finder's fee. Ron Fennick, the person who supposedly told TRG that Grand Design was open to acquisition, had never heard of an industry standard finder's fee. Mike Happi, Winnebago's CEO, had no knowledge of a finder's fee being paid under these circumstances. Under these facts and circumstances, the court cannot assume that the jury would have found an industry standard if it had been properly instructed. Unless there are further questions, we will respectfully ask the court to reverse. Thank you. Thank you very much. The case shall be submitted.